## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JOSHUA DYAL, CHRISTOPHER POPP,      )
JASON PANICO, RICHARD WEBER,      )
ROBERT WEICHMANN, DEAN ZERVAS,      )
AND MARCOS CAMPOS,      )
     )
     *Plaintiffs*,      )    No. 12 C 9687
     )
vs.      )    Judge Thomas M. Durkin
     )
PIRTANO CONSTRUCTION, INC.,      )
INSTALLATION PROFESSIONALS, L.L.C.,      )
MIKE PIRAINO, JOE PANTANO, JACK HORN, AND      )
MIKE MOREAU,      )
     )
     *Defendants.*      )

## MEMORANDUM OPINION AND ORDER

Defendant PirTano Construction, Inc. has a contract with Comcast Cable to provide cable installation work to Comcast customers. It provides those services through a separate entity and operating division called Installation Professionals, LLC. Plaintiffs were employed by Installation Professionals between 2010 and 2013 as cable installation technicians. Plaintiffs allege that PirTano, Installation Professionals, and various principals of those two companies,[1] processed deductions from their wages in violation of the Illinois Wage Payment and Collection Act ("IWPCA") (Count I), and failed to pay overtime as required by the Illinois Minimum Wage Law ("IMWL") (Count II) and the Fair Labor Standards Act

---

[1] Defendant Jack Horn is employed as the treasurer for PirTano and owns one-third of that company. Defendants Mike Piraino and Joseph Pantano own the other two-thirds. R. 123, Resp. to Plaintiffs' Statement of Material Facts ("PSMF"), ¶ 9.

("FLSA") (Count III). A fourth count of the amended complaint alleges violations of the Uniformed Services Employment and Reemployment Rights Act ("USERRA") on behalf of Plaintiff Dyal only. The parties have filed cross-motions for summary judgment. For the reasons that follow, Defendants' motion is denied in part and granted in part and Plaintiffs' cross-motion is denied.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## BACKGROUND

Plaintiffs worked for Installation Professionals as "installation technicians" at various points between 2010 and 2012.[2] Installment Professionals is an operating

---

[2] The Court acknowledges Plaintiffs' position that all of the named Defendants are liable as their "joint employer." The Court will refer to Installment

division of PirTano, which has a contract with Comcast to install and service cable television, internet, and telephone services for Comcast. R. 123, Resp. to Plaintiffs' Statement of Material Facts ("PSMF"), ¶¶ 7, 9. When Comcast needs installation services, it generates work orders and conveys them to Installment Professionals. The technicians who work for Installment Professionals receive a route each morning when they report to work consisting of three to eight Comcast work orders. *Id.* at ¶ 21. Each work order describes the work needed to be done, the customer's name, address, and contact number, and the time frames when the technician needs to arrive at the customer's location. *Id.* The technicians are then dispatched to the addresses on their route to complete the work. The number of stops or jobs each technician receives each day varies on the day's workload, the type of job, and the technician's skillset. *Id.* at ¶ 23. At the end of the day, the technicians turn in a worksheet showing the jobs they completed and what work was done for each job. The worksheets are reviewed by Michael Pocasangre, PirTano's office manager, who compares the work listed as having been completed with Comcast records. *Id.* at ¶¶ 27–29. The manager then totals up the allowable tasks and the information is recorded and conveyed to Comcast, which then pays PirTano for the work done by the technicians. The technicians, in turn, get paid a set amount per task. The set amounts are listed on a rate sheet, which is applied to the worksheets. R. 123, Resp. to PSMF, ¶ 31.

---

Professionals as Plaintiffs' employer in this background section, and reserve resolution of the legal dispute over joint employment until later in this opinion.

The amounts technicians are paid for each item of service varies based on the value of that service, but the technicians generally receive 40%-60% of the amount Comcast paid for the service. For example, a technician would earn $38.74 for a "G-6 CDV & HSD Installation (Sep. Trip)" and Comcast was invoiced $80.74, which means the technician earned about 48% of what Comcast was invoiced for that service. If the technician installed an "F-3b Additional Outlet (New)(Same Trip)," it had a value of $10.17 and Comcast was invoiced $18.35, so the technician received about 55% of the amount billed to Comcast for that service. R. 128, Resp. to Defendants' Statement of Additional Facts ("DSAF"), ¶ 30. The amounts owed to the technician for each task listed on the worksheets are totaled up, and the technician is paid accordingly. Thus, the technicians' pay was based on what they billed no matter how many hours they worked. R. 123, Resp. to PSMF, ¶ 35.

## ANALYSIS

Both parties filed motions for summary judgment. Defendants argue summary judgment in their favor is appropriate in the following respects: (1) on Plaintiffs' overtime wage claims under the FLSA and the IMWL, because those claims are barred by the "retail or service establishment" exemption of the FLSA, 29 U.S.C. § 207(i) (hereinafter "Section 7(i)"); (2) on the three-year FLSA statute of limitations, because the evidence is insufficient to show willfulness; (3) on Plaintiffs' IWPCA claim, because the undisputed evidence shows that all payroll deductions were made in compliance with that statute; and (4) on Plaintiff Dyal's USERRA claim, because it is based on conclusory allegations unsupported by the evidence.

Plaintiffs' summary judgment motion focuses on the overtime wage claims under the FLSA and the IMWL. Specifically, Plaintiffs argue that the 7(i) exemption does not apply because they were not paid based on commission, and that as a result, Defendants failed to pay them overtime wages required by the FLSA. Plaintiffs also argue that the Defendants are their joint employers and that they willfully violated the FLSA, extending the limitations period from two years to three years. Plaintiffs did not make any arguments as to the IWPCA or the USERRA claims in their affirmative summary judgment motion. Because the majority of the parties' briefings focus on the FLSA and the IMWL, the Court will begin there.

## I.   FLSA AND IMWL (COUNTS II AND III)

### A. THE SECTION 7(i) EXEMPTION

The FLSA and the IMWL generally require that employees be paid one and one-half times their hourly wage for every hour worked in excess of forty hours per workweek. *See* 29 U.S.C. § 207(a)(1); 820 ILCS 105/4a(1). Section 7(i) of the FLSA exempts employers from complying with that overtime requirement if they employ (1) employees of a retail or service establishment; (2) the regular rate of pay of such employees is in excess of one and one-half times the minimum hourly rate; and (3) more than half of the employees' compensation for a representative period represents commissions on goods or services. 29 U.S.C. § 207(i). The IMWL likewise exempts from overtime coverage "[a]ny commissioned employee as described in

paragraph (i) of Section 7 of the [FLSA] and rules and regulations promulgated thereunder." 820 ILCS 105/4a(2)(F).

Importantly, Section 7(i)'s exemption from the FLSA's minimum wage requirements "should not be interpreted so broadly that it renders the statutory remedy ineffectual or easily evaded." *Yi v. Sterling Collision Ctrs.,* 480 F.3d 505, 508 (7th Cir. 2007). Exemptions under the FLSA are to be narrowly construed against the employers seeking to assert them. *See Lederman v. Frontier Fire Protection, Inc.*, 685 F.3d 1151, 1157 (10th Cir. 2012). As a practical matter, this means that a close case will be resolved against applying the exemption. *Yi,* 480 F.3d at 508 ("principle of narrow interpretation of exemptions is a tie breaker" (citing *Mechmet v. Four Seasons Hotels, Ltd.,* 825 F.2d 1173, 1177 (7th Cir. 1987))). Assuming Plaintiffs work more than 40 hours per week, for Defendants to be entitled to summary judgment on Plaintiffs' IMWL and FSLA claims based on Section 7(i), it must be clear from the undisputed facts that: (1) Installment Professionals is a "retail or service establishment"; (2) Plaintiffs' regular rate of pay is at least one and one-half times the minimum wage; and (3) more than half of Plaintiffs' compensation for the representative period is from commissions. *See Alvarado v. Corporate Cleaning Serv., Inc.*, 782 F.3d 365, 366 (7th Cir. 2015). The exemption must also be in accordance with the FLSA's concerns about the welfare of employees. *Id*. at 371. The Court will address each of these required showings in turn.

### 1. IS INSTALLMENT PROFESSIONALS A RETAIL OR SERVICE ESTABLISHMENT?[3]

Whether Installment Professionals "is a retail or service establishment is a matter of statutory construction and is thus a question of law to be determined by the [c]ourt." *Reynolds v. Wyndham Vacation Resorts, Inc.*, 2016 WL 362620, at *5 (D.S.C. Jan. 29, 2016). In *Alvarado¸* the Seventh Circuit decided that a company that provided window washing services was a "retail or service establishment" using a straightforward analysis based on the language of the statute:

> [T]o prevail CCS must show . . . that the company is a retail or service establishment, terms not defined in the statute. A "retail establishment" sounds like a store, which CCS is not; "service establishment" is much broader. CCS is selling a service, not goods, and that as we've seen is supportive of the exemption. . . .
>
> As a service establishment CCS meets the "retail *or* service establishment" requirement in section 207(i). If that weren't enough (though it is), CCS is probably best described as a retail service establishment.

782 F.3d at 369 (emphasis in original).[4]

---

[3] Defendants argue that, by failing to discuss the first required Section 7(i) element, Plaintiffs had conceded it was met. R. 131 at 6; R. 122 at 4–8. Defendants ask the Court to find that Plaintiffs have waived the right to contest whether Installment Professionals is a "retail or service establishment." *See* R. 141 at 2–4. Although Plaintiffs failed to address the issue in response to Defendants' opening summary judgment brief, they addressed it in reply to Defendants' opposition to Plaintiffs' brief. Regardless, the burden is on Defendants to show there are no disputed issues of fact entitling them to the exemption, *see Yi*, 480 F.3d at 507, and Plaintiffs addressed the other requirements for an exemption under Section 7(i), all of which if accepted would defeat Defendants' summary judgment motion. Moreover, the Court does not perceive that Plaintiffs obtained any unfair advantage by avoiding the issue until their reply brief, even if that was their intention. The Court declines to find a waiver and will base its decision on the merits instead.

Under the Seventh Circuit's analysis, Installment Professionals easily satisfies the "retail *or* service establishment" prong of the Section 7(i) exemption. Installment Professionals sells cable installation services and therefore is a "service establishment." Plaintiffs argue otherwise, purporting to rely on a part of the *Alvarado* opinion addressing whether the window washing company was a "*retail* service establishment" because it sold its services directly to the customer without the use of any middleman. The problem with Plaintiffs' reliance on this distinguishing fact in *Alvarado* is that the language of Section 7(i) is in the alternative; that is, the employer must be "a retail *or* service establishment." If the discussion in *Alvarado* is taken at face value, the alternative language in the statute is to be read literally and nothing more than being a service establishment, retail or wholesale,[5] is required. *See Alvarado*, 782 F.3d at 369 (before addressing

---

[4] Previously, courts relied on a Department of Labor regulation to determine whether an establishment was a retail or service establishment for purposes of the FLSA exemption. In *Alvarado*, 782 F.3d at 371, the Seventh Circuit called into question the applicability of the regulation and the associated, outdated list of establishments lacking a 'retail concept' under 29 C.F.R. § 779.317.

[5] The DOL has determined that "the term 'service establishment' is to be understood to mean a '*retail* service establishment[ ].'" *Kelly v. A1 Technology*, 2010 WL 1541585, at *11 (S.D.N.Y. April 12, 2010) (emphasis added). Under the regulations, a wholesale service establishment does *not* satisfy the exemption because it is not selling services "of the type contemplated in the Act," 29 C.F.R. § 779.314. "[T]he term 'retail' is to be interpreted, in the context of the congressional purposes and objectives[,] . . . to refer to 'the traditional local retail or service establishment.'" *Kelly*, 2010 WL 1541585, at *11 (quoting 29 C.F.R. § 779.315); 29 C.F.R. § 779.318 ("Typically a retail or service establishment is one which sells goods or services to the general public. It serves the everyday needs of the community in which it is located. The retail or service establishment performs a function in the business organization of the Nation which is at the very end of the stream of distribution, disposing in small quantities of the products and skills of such organization and does not take part in the manufacturing process."); In

whether the defendant was a "retail service establishment," stating that being a "service establishment" by itself was "enough").

Plaintiffs argue this case is different and the requirements set forth in *Alvarado* are not met because Installation Professionals, through PirTano,

> contracted with Comcast to provide cable installation services to Comcast customers. . . . PirTano/Installation Professionals billed Comcast for the work done by its technicians. Then Comcast billed its customers, the ultimate customers. Based upon Judge Posner's reasoning and holdings in *Alvarado*, PirTano/Installation Professionals were wholesalers, as their services were resold by Comcast to the actual user.

R. 135 at 5–6. But Plaintiffs admit that Installation Professionals provides cable and internet products and services directly to the end user.[6] The customer receiving the goods and services is at the end of the stream of distribution and there is no reselling by that customer of the cable or internet products and services. The fact that Installation Professionals provides the installation services to the end-user in its role as Comcast's subcontractor does not alter the analysis. Numerous courts have held that providing services directly to the end user, even through

---

*Alvarado*, the court characterized the window washing company as a "retail" service establishment because "[i]t sells its window-cleaning services to building owners and managers; they are the ultimate customers; they do not resell the window cleaning, and therefore CCS is not a wholesaler." 82 F.3d at 369.

[6] *See* R. 124, Resp. to DSMF, ¶ 45 (admitting that "Installation Professionals, LLC does not take any part in the manufacturing process and the goods and services Installation Professionals, LLC provides to the end user customer are in small quantities, such that necessary products were carried in Plaintiffs' pick-up trucks, and the products and services were not for resale and the products were deactivated if taken out of the customer's house."); *Id.*, ¶ 46 (admitting that "Installation Professionals, LLC provides cable, internet and phone products and services to the general public to support the comfort and convenience of the end user customer's daily living and such products and services are not for resale.").

subcontractors, qualifies as a "retail or service establishment." *See In re Directech Sw., Inc.*, 2009 WL 10663104, * 10 (E.D. La. Nov. 19, 2009) (concluding that the fact that one entity, DirecTV, solicits and accepts payment from the customers and then pays another entity, DirecTech, for the installation work technicians perform for the satellite customers—the end users—did not make DirecTech's sale of services a sale for resale); *see also Johnson v. Wave Comm Gr LLC*, 4 F. Supp. 3d 423, 435–36 (N.D.N.Y. 2014) (holding that cable installation company was not "reselling" services of Time Warner to Time Warner's customers and rejecting the argument that the cable installation company was a wholesaler); *Jones v. Tucker Communications, Inc.,* 2013 WL 6072966 at *6 (M.D. Ga., Nov. 18, 2013) (defendant Tucker Communications provided cable, internet, and telephone repair and installation services for customers of Charter Communications; holding that Tucker's services were not being resold); *Owopetu v. Nationwide CATV Auditing Servs., Inc.*, 2011 WL 4433159, at *6 (D. Vt. Sept. 21, 2011) (defendant, whose business was to install and maintain telecommunications hardware in customers' homes for Time Warner Cable and service Time Warner's customers directly was not providing services for resale and satisfied the "retail and service establishment" prong of the FLSA exemption). As the majority of courts that have considered this issue in the context of the cable/television installation industry have held, the Court agrees that Installation Professionals is a service or retail establishment within the meaning of the FLSA.[7]

---

[7] *See Amponsah v. DirecTV, LLC*, 2017 WL 4544621, at *11–12 (N.D. Ga. Oct.

## 2. WAS PLAINTIFFS' REGULAR RATE OF PAY AT LEAST ONE AND ONE-HALF TIMES THE MINIMUM WAGE?

The second requirement for the Section 7(i) exemption is that the employee's regular rate of pay is at least one and one-half times the minimum wage. This requirement is explained in 29 C.F.R. § 779.419(b) as follows:

> The meaning of the "regular rate" of pay under the Act is well established. As explained by the Supreme Court of the United States, it is "the hourly rate actually paid the employee for the normal, nonovertime workweek for which he is employed" and "by its very nature must reflect all payments which the parties have agreed shall be received regularly during the workweek, exclusive of overtime payments." (*Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419.) It is a rate per hour, computed for the particular workweek by a mathematical computation in which hours worked are divided into straight-time earnings for such hours to obtain the statutory regular rate (*Overnight Motor Co. v. Missel*, 316 U.S. 572). By definition (Act, section 7(e), the "regular rate" as used in section 7 of the Act includes "all remuneration paid to, or on behalf of, the employee" except payments expressly excluded by the seven numbered clauses of section 7(e). . . . The requirement of section 7(i) with respect to the "regular rate" of pay of an employee who may come within the exemption which it provides is a simple one: "the regular rate of pay of such employee," when employed "for a workweek in excess of the applicable workweek specified" in section 7(a), must be "in excess of one and one-half times the minimum hourly rate applicable to him under section 6." The employee's "regular rate" of pay must be computed, in accordance with the principles discussed above, on the

---

4, 2017) (concluding that the evidence showed that DirecTV had a retail concept); *Battle v. DirecTV, LLC,* 2017 WL 4076205, at *7 (N.D. Ala. Sept. 14, 2017) (finding as a matter of law that DirecTV is a retail or service establishment); *Arnold v. DirecTV, LLC,* 2017 WL 1196428, at *9 (E.D. Mo. Mar. 31, 2017) ("the Court is satisfied that DirecTV meets the 'retail or service establishment' prong of the 7(i) exemption as it has been understood and applied in the cases").

basis of his hours of work in that particular workweek and the employee's compensation attributable to such hours. The hourly rate thus obtained must be compared with the applicable minimum rate of pay of the particular employee under the provisions of section 6 of the Act. If the latter rate is $1.60 an hour, for example, then the employee's regular rate must be more than $2.40 an hour if the exemption is to apply.

29 C.F.R. § 779.419(b).

According to Defendants, at all times relevant, the minimum hourly rate applicable under Section 206 of the FLSA was $7.25 per hour. R. 104 at 10 (citing 29 U.S.C. § 206(a)). To satisfy the second prong of the exemption, Defendants must show that Plaintiffs received an hourly equivalent exceeding $10.87. Defendants present evidence that, on average, Plaintiffs earned an hourly equivalent amount well over the $10.88 per hour threshold (ranging from $14.11 to $21.62 per hour), and annual compensation for Plaintiffs ranged from $38,272 to $55,273. *Id.* [8] While Defendants admit that "there were a few weeks where the $10.88 threshold was not met," they argue that "these almost all occurred outside the applicable limitations

---

[8] Defendants cite to the evidentiary material supportive of their argument in paragraphs 31 through 38 of their Local Rule 56.1(a)(3) fact statement. *See* R. 105. Plaintiffs give the same response to each of those paragraphs that fails to expressly deny the facts stated by Defendants and fails to cite to any specific record evidence. R. 124, Resp. to Defendants' Statement of Material Facts ("DSMF"), ¶¶ 31–38. Plaintiffs' responses do not comply with Local Rule 56.1(a). *See Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817–18 (7th Cir. 2004); *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000) ("[S]pecific reference" [in Local Rule 56.1(b)(3)(B)] means including proper . . . citations to exact pieces of the record that support the factual contention contained in the paragraph . . . District courts are not obliged in our adversary system to scour the record looking for factual disputes. Factual allegations not properly supported by citation to the record are nullities."). Because Plaintiffs have failed to properly controvert paragraphs 31 through 38 of Defendants' Local Rule 56.1(a)(3) statement, those paragraphs are deemed admitted.

period" and "the record evidence reflects these were extremely minor discrepancies that have no material consequence under the law." *Id.*

Plaintiffs' reply brief in support of their cross-motion for summary judgment concedes that they were usually paid more than $10.88 per hour. *See* R. 135 at 3–4 ("All that Plaintiffs have admitted is that their 'regular rate' usually exceeded $10.88 per hour."). Given Plaintiffs' admission in their reply brief, the only disputed issue on this prong of the Section 7(i) exemption is a legal one—whether the *de minimis* doctrine applies to the relatively few weeks in which Defendants concede that Plaintiffs were *not* paid at least 1½ times the applicable federal minimum wage. *See* R. 104 at 10 (citing *Mitchell v. JCG Indus., Inc.*, 745 F.3d 837, 841–46 (7th Cir. 2014) (recognizing the *de minimis* doctrine and that the court does not provide a remedy for small and insignificant harms)).

Plaintiffs' only argument against application of the *de minimis* doctrine is that Defendants have failed to maintain proper paycheck and paystub information as required by federal and state law, and that therefore "there is no important data to determine whether the underpaid weeks were 'trifles.'" R. 126 at 8. By this argument Plaintiffs apparently concede the applicability of the *de minimis* doctrine to the current situation, and only take issue with whether the factual predicate for application of that doctrine has been established. Neither party cites to 29 C.F.R. § 778.104, pursuant to which "each workweek stands alone such that an employee who works 30 hours one week and 50 hours the next would be entitled to overtime compensation the second week even though the average between the two weeks is

40 hours per week." *Roeder v. Directv, Inc.*, 2017 WL 151401, at *32 (N.D. Iowa Jan. 13, 2017).

> The Act takes a single workweek as its standard and does not permit averaging of hours over 2 or more weeks. Thus, if an employee works 30 hours one week and 50 hours the next, he must receive overtime compensation for the overtime hours worked beyond the applicable maximum in the second week, even though the average number of hours worked in the 2 weeks is 40. This is true regardless of whether the employee works on a standard or swing-shift schedule and regardless of whether he is paid on a daily, weekly, biweekly, monthly or other basis. The rule is also applicable to pieceworkers and employees paid on a commission basis. It is therefore necessary to determine the hours worked and the compensation earned by pieceworkers and commission employees on a weekly basis.

29 C.F.R. § 778.104; *see Johnson*, 4 F. Supp. 3d at 445 (holding that estimated hours provided by the plaintiffs in interrogatory answers could not be used to determine compensation because the regular rate of pay had to be calculated on a weekly basis). Defendants have offered no argument for why this regulation does not apply or should not be followed.[9]

---

[9] Neither side has cited to this regulation. Instead, Defendants rely on *Walton v. United Consumers Club, Inc.*, 786 F.2d 303 (7th Cir. 1986), where the Seventh Circuit said the following:

> Although United has divided Simons's total compensation by her total hours, there was no need to break both down week by week. Commission salesmen have fluctuating hours and income, and it is unlikely that Congress meant to require employers to pay overtime in the lean weeks when the fat weeks more than make up. Other cases have used periods as long as a year to establish average wages.

*Id.* at 307. There is no discussion in *Walton* of 29 C.F.R. § 778.104. As neither party has provided any guidance on how to interpret the view expressed by the court in

*Mitchell* and the cases on which it relies for the *de minimis* doctrine determined what was compensable working time for purposes of calculating the number of hours an employee worked each week. *See Mitchell*, 745 F.3d at 843. Defendants cite no relevant authority that applies the same doctrine to override the weekly computation requirement of 29 C.F.R. § 778.104. Under that regulation, Defendants can rely on the Section 7(i) exemption only for the weeks in which they have not conceded that Plaintiffs did not earn the equivalent of $10.88 per hour.

As for the other weeks in question, Plaintiffs' concession ends the matter. Plaintiffs attempt to defeat summary judgment by arguing Defendants failed to keep adequate records of the total hours worked. The Eleventh Circuit reversed the district court's entry of summary judgment on that issue in *Klinedinst v. Swift Investments, Inc.*, 260 F.3d 1251(11th Cir. 2001), because neither party kept records of the number of hours worked, and thus it was impossible to calculate the plaintiff's "regular rate" to compute his overtime compensation. *Id.* at 1257.

But Plaintiffs make little more than a perfunctory argument on this point, and, as previously noted, they failed to properly support their indirect denial of Defendants' fact statements that provide the basis for finding that Defendants satisfied this element of the Section 7(i) exemption in all but a few of the potentially relevant weeks. *See Roeder,* 2017 WL 151401, at *31 (where "plaintiffs' own testimony establishes they were paid more than one and one-half times the applicable minimum wage," court holds that "DIRECTV has met its burden of

---

*Walton* that "fat weeks" can make up for "lean weeks" in light of 29 C.F.R. § 778.104, the Court will follow the clear language of the regulation.

showing that plaintiffs' regular rate of pay was above one and one-half times the minimum wage"). The Court is not required either to make Plaintiffs' undeveloped legal arguments for them, *see Northbound Group, Inc., v. Norvax, Inc.*, 5 F. Supp.3d 956, 973–74 (N.D. Ill. 2013), *citing United States v. Hook*, 471 F.3d 766, 775 (7th Cir. 2006), or sift through the record to ferret out the evidence that may exist to support those arguments, *see Roeder,* 2017 WL 151401, at *32 (rejecting plaintiffs' attempt to avoid summary judgment by arguing "that their weekly compensation estimates do not account for chargebacks or unreimbursed business expenses," because they had "not pointed to any evidence that deducting those items would reduce their rates of pay, as calculated on a weekly basis, below one and one-half times the minimum wage"). Accordingly, there is no disputed issue of fact regarding whether Plaintiffs were paid at least one and one half the minimum wage for weeks in Defendants' spreadsheets showing an average rate of pay of at least $10.88 per hour.

### 3. WAS MORE THAN HALF OF PLAINTIFFS' PAY COMMISSIONS?

Plaintiffs contend that technicians are piece-rate workers, while Defendants argue they are employees paid by commission. The distinction is important because "employees paid by commission are exempt from the FLSA's overtime provision, while employees paid on a piece-rate basis are not." *See Alvarado v. Corp. Cleaning Serv., Inc.*, 2013 WL 6184044, at *6 (N.D. Ill. Nov. 18, 2013) (comparing 29 U.S.C. § 207(i), with 29 U.S.C. § 207(g)). In a piece-rate system, a worker is paid by the item produced by him—a scarf, for example. In a commission system a worker is

paid by the sale—so if he works for a shoe store he is paid a specified amount per pair of shoes that he sells. A scarf worker is paid for making scarves even if they have not been sold, while the shoe salesman is paid only when he makes a sale. *Alvarado*, 782 F.3d at 367. The FLSA defines neither "piece-rate" nor "commission."

Commission based compensation systems are properly exempt from the FLSA because the exemption ensures employees are not paid more through overtime pay when they have not actually worked more hours over the course of the year than an average employee. The Seventh Circuit explained the rationale of the exemption in *Alvarado*:

> Suppose the hourly wage in two separate businesses is an identical $15. In one business the work is steady and the worker works 2000 hours a year ($15 per hour x 40 hours x 50 weeks = $30,000). There is no overtime, so no requirement of time and a half pay ($22.50) per overtime hour. In the other business the worker also works 2000 hours a year, but he does no work at all for 10 weeks of the year and in the remaining 40 weeks (we're assuming that both workers take a two-week unpaid vacation) he works 50 hours a week. Were he entitled to overtime for 10 hours each week for the 40 weeks he works, his total wages for the year would be $15 per hour x 40 hours (= $600) + $22.50 x 10 hours (= $225), a total of $825 a week, which times 40 weeks equals $33,000. In this example, both workers work the same number of hours a year, at the same job, but the one who works irregular hours is paid 10 percent more. That doesn't make any sense. The anomaly, which we said in *Yi* is "the rationale for the commission exemption from the FLSA's overtime provision," *Yi v. Sterling Collision Centers, Inc., supra,* 480 F.3d at 508, is avoided by recognizing that the second set of workers, corresponding to our window washers, are commission workers and therefore have no statutory entitlement to overtime pay.

*Alvarado* at 369. Thus, an employee working about 2,000 hours a year is working an average amount and is not entitled to overtime pay—the equivalent of 40 hours a week with two weeks of annual vacation—regardless of whether he spends a few weeks in Mexico and works 70 hours a week the remainder of the year. *See also Yi*, 480 F.3d at 510. In *Yi*, the court found a commission system existed where an auto body shop calculated the number of hours typically required to perform a given task ("booked hours") and multiplied that number by a dollar figure. A team of mechanics would be assigned a task and each worker would keep track of their actual hours spent on the assignment. Once the laborers completed the job, the auto body shop calculated their compensation by multiplying (1) the number of booked hours for the task by (2) the ratio of the team member's actual hours worked to the total hours worked by the team by (3) that employee's wage rate, which was based on his or her skill level. 480 F.3d at 509. In considering whether the auto mechanics' compensation scheme was a commission system, the *Yi* court found the fact that compensation was based on efficiency important:

> [T]he faster the team works, the more it earns per number of hours, since its commission is based not on the total number of hours it puts in on a job but on the number of booked hours times each team member's [personal rate based on his or her skill level]. That is how commissions work: they are decoupled from actual time worked.

*Id.* The *Yi* court also found that a bona fide commission is one where "the relation [between income and hours worked] is unlikely to be a regular one." *Id.* at 508. Likewise in *Alvarado*, upon receiving a window-washing order, the company

assigned "points" to the job based on its perceived difficulty. The company compensated the window-washer by multiplying the number of points the washer worked by an hourly rate specific to that worker. *Alvarado,* 782 F.3d at 367. Accordingly, the faster a window-washer worked, the more points he could accumulate and thus increase compensation for that pay period. The Seventh Circuit stressed that the work involved irregular hours was an important consideration in the determination of a commission system. *Id.* at 368.

Here too, Defendants assign a certain number of "points" to each job—through the use of a rate sheet that determines how much the employee receives per task. R. 123, Resp. to PSMF, ¶ 27. Plaintiffs receive a portion of the amount the customer pays, usually between 40% to 60% of the customer's costs. R. 128, Resp. to DSAF, ¶ 30. On its face, the system looks identical to the systems in *Yi* and *Alvarado*—Plaintiffs get paid the same amount regardless of whether the task takes them one hour or seven. But Plaintiffs argue they were not paid on a commission system because they were given no incentive to work efficiently because of two practices unique to their employment. First, Plaintiffs were required to arrive at customers' residences within a promised block of time, leading to hours of "downtime" each week. Second, Plaintiffs allege they were told to do work for customers for free and had services that they had completed written off by supervisors if they did not match the work orders given by Comcast. R. 126 at 9–10. These practices led to Plaintiffs working well over the 2,000 hours prescribed by *Yi* and *Alvarado*, in violation of the FLSA's overtime purposes.

There is no bright-line rule to determine whether a compensation system is commission based. Instead, the Seventh Circuit in *Yi* and *Alvarado* focused on a number of factors. First, it noted that a bona fide commission is usually a percentage or proportion of the ultimate price passed on to the consumer. *See Yi*, 480 F.3d at 508. Second, a bona fide commission is decoupled from actual time worked, so that there is an incentive for the employee to work more efficiently and effectively. *Id.* at 509. Third, the type of work is such that its "peculiar conditions" do not lend the work to a standard eight-hour work day. *Alvarado*, 782 F.3d at 368. Rather, the work is driven by customer demand and other circumstances outside the employee's control. *Id.* at 368 (for example, window washers cannot work in certain weather conditions and residential building managers do not allow work to be completed during times that would disturb residents).[10] Finally, the court in both cases analyzed the purpose of the FLSA to ensure that the exemption did not "render[] the statutory remedy ineffectual or easily evaded." *Yi* at 508. The Court analyzes each factor now.

### 1. PERCENTAGE-BASED PAYMENTS

---

[10] Courts in other circuits, relying on the Seventh Circuit in *Yi*, have likewise applied these factors. *See Owopetu v. Nationwide CATV Auditing Servs., Inc.*, 2011 WL 883703, at *4 (D. Vt. Mar. 11, 2011) ("In practice, courts have generally concluded that there are three components to a commission-based compensation scheme: (1) the employee's compensation must be tied to customer demand or the quantity of sales; (2) the compensation plan must provide performance-based incentives for the employee to increase his or her income; and (3) there must be proportionality between the value of the goods or services sold, and the rate paid to the employee.") (internal citations to *Yi* and cases citing *Yi* omitted); *see also Johnson*, 4 F. Supp. 3d at 442.

It is undisputed that Plaintiffs received a percentage of an amount paid by Comcast for the work performed. R. 128, Resp. to DSAF, ¶ 30.[11] This points to a commission plan. *Yi*, 480 F.3d at 508. Even if work sheets were sometimes changed to remove tasks that technicians in fact performed or if technicians were told to do work for free to keep a customer, those are common practices of commission systems that do not make a compensation structure necessarily piece-rate. In *Alvarado*, for example, there was evidence that the employer made adjustments to the price of services because of competition or a desire to keep good relations with customers. *Alvarado*, 782 F.3d at 367. The court specifically noted that adjustments made to the percentage of the price—such as adding the costs of permits and equipment rentals, rounding the price to the nearest $25 increment, and reducing the price because of competition or a desire to maintain good relations with customers— caused the percentage of the price attributable to window washers' compensation to vary, but did not invalidate the compensation system as a commission system. *Id.* at 367–368. The overwhelming evidence suggests Plaintiffs were paid a percentage for the work performed.

### 2. PERFORMANCE-BASED INCENTIVES

It is also undisputed that Plaintiffs were not paid based on hours worked, but rather on the services performed. *See* R. 107, PSMF, ¶ 27 ("The technicians are paid

---

[11] Plaintiffs' contradictory earlier efforts to dispute that evidence, *see* R. 124, Resp. to DSMF, ¶¶ 24, 26, are not supported by specific references to the record and the Court should deem those statements admitted. However, because the Plaintiffs admit the evidence in later pleadings, the Court relies on the undisputed contentions in the cited paragraph.

based on the work they do at a customer site based on rate sheets that are provided by Comcast. They are not actually paid per hour."); R. 123, Resp. to PSMF, ¶ 27 ("Defendants admit [Plaintiffs] are paid based on the work they do at a customer site based on incentive rates associated with each item of work and Plaintiffs were not actually paid per hour.").

But the parties have differing views on whether Plaintiffs were incentivized to work faster and more efficiently. For example, Defendants allege Plaintiffs had the ability to perform custom and additional work for customers, which resulted in more work and pay. *See* R. 105, DSMF, ¶ 23 ("Installation Technicians, including Plaintiffs, could (and did) offer and arrange to provide additional products and services to customers while onsite at the customer location."). Plaintiffs dispute these assertions, arguing instead that they were not permitted to upsell products and that if they did, the billing office would change the billing sheet to the original order so that the technician did not receive additional pay for additional work. *See* R. 124, Resp. to DSMF, ¶ 23; R. 128, Resp. to DSAF, ¶ 32.

Both sides cite to PirTano's office manager's testimony in support, but that testimony is unclear. *See* R. 105-23, Pocasangre Dep. at 7:7–10 (the responsible PirTano manager compared the technician's worksheets with "a report Comcast provides to us"); *id.,* Pocasangre Dep. at 12:16–24 ("Q. . . . How do you know when to circle something and how do you know when to cross something out? A. Through the information provided from Comcast. For every job, they will give us a list of *what should be — what was done* at that house basically. And so I take this sheet and

look at that and match it up with what Comcast said, and then that's how I appropriately bill it.") (emphasis added). Defendants also cite the testimony of Plaintiffs' supervisor, Brian Mortensen, but his testimony is also unclear. *See* R.105-22, Mortensen Dep. at 32:8–16 ("Q. When you got billing sheets then at the end of the day, how was Comcast billed for the work that was done? A. Comcast isn't really billed for the work that's done until the technician closed out the job. If the job is billed and says he ran five outlets, if that's what Comcast's billing system reflects, then that's essentially what we get paid and I would transfer that to the technician."). Despite this ambiguity, however, Pocasangre admitted that, if the technician lists a task as having been done that was not part of Comcast's work order, the manager crosses the item out, and the technician does not get paid for it. R 123, Resp. to PSMF, ¶ 28. Defendants admit Plaintiff Weichmann testified that occasionally numbers were changed on billing sheets and gave the example of changing the number of outlets installed from three to two. R. 123, Resp. to PSMF, ¶ 28.

Plaintiffs also argue that there were "[m]any weeks" when they "had 10 to 15 hours down time where [they] [were] required to sit and wait in a customer's driveway because the customer was not home when [they] arrived to do the job. There were also instances where [they] finished a job and the next one didn't start for several hours so [they] [were] told to sit in the truck and wait for the next job." R. 107-35, ¶ 15; *see also* R. 107-36, ¶ 15; R. 107-37, ¶ 15; R. 105-2, Weichmann Dep. at 79–81. They were not paid for these periods of downtime.

Defendants do not dispute that Plaintiffs had periods of downtime, and instead argue Plaintiffs could pick up additional assignments or go home. *See* R. 105, DSMF, ¶ 22 ("During these down periods Plaintiffs could spend the time as desired, including seeking out other assignments, going home, running errands or just sitting in the truck doing as they wished, such as playing on the phone, or talking with other Technicians."); R. 125, DSAF, ¶ 31 ("Technicians that completed work early could be assigned additional work or had the opportunity to assist other Technicians running behind to receive additional pay."). But Plaintiffs present evidence that picking up additional tasks in those periods of downtime was often impractical. R. 107-14, Weichmann Dep. at 78:3–9 ("Q. And you are saying that's rare? A. To be done at 2:00, yes. Q. Well, I'm not seeing the harm in having the 5:00 to 7:00. You already are going to be picking up other work? A. I don't think I'm going to be picking up other work in between there."). Plaintiff Weichmann also testified he was prohibited from going home because he had a company truck. R. 107-14, Weichmann Dep. at 79:14–20 ("No. You had a company truck and their gas. You weren't supposed to, you know, just drive around. You couldn't go home and come back out, unless you called for permission, and you were by your house, but that was very rare that I would be by my house. So it was down, dead time, sitting."). Finally, Plaintiff Weichmann testified he often experienced periods of downtime because no other technicians were available to pick up later shifts—when he asked his supervisors to remove a later shift off his route (causing a long break),

his supervisors would often tell him there was no one else out there so he had to stay on. R. 107-14, Weichmann Dep. at 80:3–14.

It is true that courts have found commission based systems exist with similar compensation structures paid to cable installers. However, in those cases, there was no dispute that the compensation scheme incentivized employees to work faster. In *Johnson*, 4 F. Supp. 3d 423, for instance, the technicians could "contact Wave Comm and request additional work orders" when they finished their normal work assignments, thereby earning more money. *Id.* at 443. In *Moore v. Advanced Cable Contractors, Inc.*, 2013 WL 3991966 (N.D.Ga. Aug. 1, 2013), the technician-plaintiffs' "own deposition testimony state[d] that there were ample opportunities for technicians to get additional work if they completed their scheduled appointments ahead of time." *Id.* at \*5. Technicians were even "paid extra if they sold customers upgraded service packages or hardware not on their scheduled work-orders." *Id. See also Jones,* 2013 WL 6072966 at \*1–2 (technicians could pick up additional jobs during the day by entering "available" on their PDAs and could sell Charter products and service, a contracted amount of which would be paid directly to them); *Owopetu v. Nationwide CATV Auditing Services, Inc.*, 2011 WL 883703 at \*5 (D. Vt., March 11, 2011) (undisputed that the faster a technician completed one work order, the sooner he could complete the next one and earn forty-five percent of the rate). But here there is no undisputed evidence that Plaintiffs "had the opportunity to earn additional income by working faster and completing more

tasks," *Johnson* at 443, or that technicians had the "opportunity to pick up additional jobs during the day." *Jones*, 2013 WL 6072966 at *10.

There is thus a genuine issue of material fact as to whether Plaintiffs were given performance-based incentives that actually decoupled hours worked from wages. As a result, Defendants have not met their burden in showing this factor.

### 3. IRREGULAR HOURS

The *Alvarado* court found the existence of irregular hours to be the most telling aspect of a commission based system. *Alvarado*, 782 F.3d at 368. The Seventh Circuit there noted that the hours were so irregular for the window washers that most would spend the winter in Mexico because work was sparse, but would work enough hours to make up that time in non-winter months to average 2,000 hours a year.

Here, there is no genuine dispute that Plaintiffs worked irregular hours based on customer demand. *See* R. 123, Resp. to PSMF, ¶ 23 (admitting number of stops or jobs Plaintiffs did in a given day depended on the workload); ¶ 36 (admitting hours fluctuated day to day and that Plaintiffs often worked into the evening hours); R. 124, Resp. to DSMF, ¶ 20 (admitting Plaintiffs did not work standard shifts and their end time for the day varied). Defendants have met their burden on this factor.

### 4. PURPOSE OF THE FLSA

But the Court's inquiry cannot stop there, because the irregular hours Plaintiffs endured do not mimic the irregular hours found to be appropriate of an

overtime exemption in *Alvarado* and *Yi*. The Seventh Circuit in those cases emphasized the drastic irregularity of hours usually endured by commission based employees, but in both cases the workers' annualized hours amounted to a normal year—approximately 2,000 hours.[12] Here, however, the undisputed evidence showed irregular hours, but also constant and steady work—Plaintiff Weichmann testified there were some busy seasons, but that the work was generally steady. R. 105-2, Weichmann Dep. at 49:1–5 ("Q. Was there a busy season when you worked at PirTano? A. Some busier than others. It was generally busy. College, you know, starting would be a busy season, things of that nature.").

What further differentiates this case from *Yi* and *Alvarado* is the number of hours worked by Plaintiffs. Defendants presented evidence that Plaintiffs worked well in excess of 2,000 hours a year. *See* R. 125, DSAF, ¶ 3 (Plaintiff Weichmann worked 2,470 and 2,429 hours in 2010 and 2011, respectively); ¶ 5 (Plaintiff Zervas worked 2,345 and 2,637 hours in 2010 and 2011, respectively); ¶ 8 (Plaintiff Popp worked 2,204 and 2,502 hours in 2010 and 2011, respectively); ¶ 10 (Plaintiff Panico

---

[12] *See also, Yi*, 480 F.3d at 508 ("The essence of a commission is that it bases compensation on sales, for example a percentage of the sales price, as when a real estate broker receives as his compensation a percentage of the price at which the property he brokers is sold. Although his income is likely to be influenced by the number of hours a week that he works, the relation is unlikely to be a regular one. In one week business may be slow; he may make no sales and thus have no income for that week. The next week business may pick up and by working overtime that week he may be able to make up the income he lost because of slack business the previous week. Over a year his hours of work may be similar to those of regular hourly employees. So if he had to be paid overtime, his annual income would be higher than theirs even though he hadn't worked more hours over the course of the year than they had. We take this to be the rationale for the commission exemption from the FLSA's overtime provision.").

worked 2,436 hours in 2011); ¶ 14 (Plaintiff Weber worked 2,585 hours in 2011); ¶ 16 (Plaintiff Campos worked 2,898 hours in 2012). This leads the Court to question whether the compensation structure used by Defendants furthers the purpose of the FLSA regarding the overtime pay requirements.

The FLSA has three primary purposes—to spread work to reduce unemployment, to discourage (by increasing the cost to the employer) a degree of overtime that might impair workers' health or safety, and to increase the welfare of low-paid workers. *Yi*, 480 F.3d at 510; *Alvarado*, 782 F.3d at 371. In *Alvarado*, the court found that overtime pay would not further the purpose of spreading work to reduce unemployment because the plaintiffs there had not shown that they were working more than 2,000 hours on average. *Alvarado* at 371. Here, however, the evidence indicates the Plaintiffs were working well in excess of the 2,000 hour benchmark. But even the extreme amount of hours Plaintiffs worked can be ameliorated if the system was truly a commission based system that incentivized Plaintiffs to work more efficiently. That Defendants had an abundance of work does not affect whether the system is commission based. *See Alvarado*, 2013 WL 6184044, at *7. If the system was not commission based, however, then the purpose of the FLSA would not be met by granting Defendants the exemption.[13] In that

---

[13] The remaining purposes of the FLSA are not implicated here. There was no evidence presented that the amount of hours worked by Plaintiffs was causing workplace injuries due to fatigue, nor does common sense indicate there would be injuries—installing cable lines inside of consumers' homes is far less dangerous than window washing. Finally, Plaintiffs are not low-wage workers—their yearly income ranged between $38,272 and $55,273. R. 105, DSMF, ¶ 31; s*ee Alvarado* at

case, employees would be better served by either overtime pay or Defendants hiring additional employees. The jury's determination of whether the structure provided incentives to employees to work more efficiently will thus answer whether the system was in fact commission based and whether the purposes of the FLSA are furthered through the exemption.

Because there is a genuine dispute of material fact as to whether the compensation structure incentivized Plaintiffs to work more efficiently, and thus it is disputed whether the system was commission based, Defendants' summary judgment motion on the Section 7(i) exemption is denied.

## B. FLSA STATUTE OF LIMITATIONS

Defendants next argue that the applicable statute of limitations under the FLSA is two years because Plaintiffs cannot show any willful violations. "[T]he statute of limitations for FLSA violations is two years unless the violation was willful, in which case the limitations period is three years." *Howard v. City of Springfield, Ill.*, 274 F.3d 1141, 1144 (7th Cir. 2001) (citing 29 U.S.C. § 255(a)). "The plaintiff bears the burden of establishing willfulness for purposes of the statute of limitations." *Caraballo v. City of Chicago*, 969 F. Supp. 2d 1008, 1024 (N.D. Ill. 2013). "[A]n employer's mere negligence or a good faith—but incorrect—belief that they were in compliance with the FLSA, are not sufficient to rise to the level of a willful violation." *Difilippo v. Barclays Capital, Inc.*, 552 F. Supp. 2d 417, 425 (S.D.N.Y. 2008). "Furthermore, an employer has not willfully violated the FLSA if it

371 (noting the annual pay of the window washers was between $40,000 and $60,000).

acts reasonably in determining its legal obligation." *Pignataro v. Port Authority of N.Y. and N.J.*, 593 F.3d 265, 273 (3d Cir. 2010) (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 135 n. 13 (1988)). To establish willfulness, Plaintiffs must show that Defendants "either knew [they were] violating the Act or [were] indifferent to whether [they were] violating it or not (and therefore "reckless")." *Caraballo,* 969 F. Supp. 2d at 1024–25 (quoting *E.E.O.C. v. Madison Cmty. Unit School Dist. No. 12*, 818 F.2d 577, 585 (7th Cir. 1987)); *see also McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133 (1988) (violations under the FLSA are willful if the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute").

Although whether an employer has acted willfully is a question of fact, Plaintiffs must present sufficient evidence of willfulness to survive summary judgment. *Pignataro*, 593 F.3d at 273 (affirming district court's summary judgment finding that employer's violation of the FLSA was not willful). Defendants argue that Plaintiffs cannot present any evidence of willfulness. Plaintiffs, on the other hand, cite to evidence showing that PirTano and Installation Professionals were investigated by the U.S. Department of Labor. While Defendants argue the investigation and its results are irrelevant, R. 123, Resp. to PSMF, ¶¶ 46–50, the Court cannot make that determination on summary judgment. The documents cited by Plaintiffs support their argument that the investigation disclosed that Defendants' employees were subject to the requirements of the FLSA, that Defendants were informed of past violations of the FLSA, and that Defendants

"agreed to comply fully with all the provisions of the FLSA in the future." *Id.* This evidence thus appears to be relevant to and probative of the willfulness question. *See, e.g., Chao v. A-One Med. Servs., Inc.,* 346 F.3d 908, 919 (9th Cir. 2003) ("The fact that A-One previously had run-ins with the Labor Department certainly put A-One and Black on notice of other potential FLSA requirements."). Nor can the Court find for Plaintiffs on the issue. They argue the fact of the investigation alone is sufficient to find willfulness based on *Donovan v. Sabine Irrigation Co.,* 695 F.2d 190 (5th Cir. 1983). But *Donovan* relied on a Fifth Circuit standard of willfulness that was later rejected by *McLaughlin*, 486 U.S. at 133 (rejecting a standard for willfulness that only requires a plaintiff to show the defendant knew the FLSA "was in the picture"), and thus is insufficient to find for Plaintiffs. Defendants' summary judgment motion as to whether the two-year statute of limitations applies is denied.

### C. PLAINTIFFS' SUMMARY JUDGMENT MOTION

Because the Court held that a reasonable jury could find that Defendants are not entitled to the overtime exemption, Plaintiffs' claim for overtime wages is still alive. Plaintiffs seek summary judgment that they have proven the elements of their claim (although final judgment will have to await a jury decision on the exemption question). To prevail on their FLSA claim, Plaintiffs must prove that: (1) they worked overtime without compensation; and (2) their employer knew or should have known of the overtime work. *See Kellar v. Summit Seating, Inc.*, 664 F.3d 169, 173, 177 (7th Cir. 2011); *see also* 820 ILCS 105/4a ("[N]o employer shall employ any of his employees for a workweek of more than 40 hours unless such employee

receives compensation for his employment in excess of the hours above specified at a rate not less than 1 1/2 times the regular rate at which he is employed.").

### 1. HOURS AND WAGES

The crux of Plaintiffs' argument is that Defendants failed to pay Plaintiffs for certain time periods worked—including for 6:30am early start times, unused lunch breaks, and downtime between jobs—under the guise of paying them under a commission based system. Accordingly, if a jury finds that the compensation system at issue was commission based, Plaintiffs' exact hours worked are irrelevant because Plaintiffs have conceded that they were paid at least the hourly wage required to meet the Section 7(i) exemption. *See* Section I.A.2. If a jury does not find the system was commission based, however, then Plaintiffs were entitled to be paid an hourly wage and overtime pay for any weeks worked in excess of 40 hours.[14]

Determining whether Plaintiffs worked over 40 hours in each given week should be a relatively easy task. However, Plaintiffs argue that Defendants failed to maintain records of Plaintiffs' lunch breaks and downtime, R. 118 at 7, and thus they should be allowed to submit documentation as to their correct hours worked, or in the absence of documentation, rely on their own recollection. *See* R. 118 at 6. But Plaintiffs present no evidence that Defendants failed to maintain accurate records. Instead, Defendants presented evidence that although they did not keep exact physical paystubs, they maintained the information used to generate those

---

[14] The Court will reserve determination of the correct hourly wage and overtime payment until after a jury has decided whether Defendants are entitled to rely on the Section 7(i) exemption and the correct amount of hours worked by Plaintiffs each week.

paystubs through spreadsheets created weekly in the regular course of business. R. 105-1, Horn Dep. at 56:21–24, 57:1–2; R. 105-3, Stahulak Decl. at ¶¶ 6, 13. In fact, the spreadsheets are based on information provided by Plaintiffs—Plaintiffs filled out daily worksheets to identify all products and services completed for the day and the total hours worked each day. R. 105, DSMF, ¶ 27. The daily worksheets included their start and stop time for the day. R. 124, Resp. to DSMF, ¶ 29; R. 107, PSMF, ¶ 41. The hours worked were reflected on Plaintiffs' paystubs. But the hours did not affect their pay, because—at least according to Defendants—they were paid through a commission system. R. 124, Resp. to DSMF, ¶ 24, 29. Accordingly, Defendants generally maintained accurate hourly information, and the Court will rely on those billing sheets for the start and end times of Plaintiffs' hours calculation. As to the remaining time, Plaintiffs allege Defendants did not keep track of early start times, unused lunch breaks, and downtime.[15] The Court will address each time period individually.

First, there is a genuine dispute of fact as to whether the billing sheets reflected accurate start times.[16] In Plaintiffs' Statement of Material Facts, Plaintiffs

_____

[15] Plaintiffs make a passing argument that the early start times and the downtime was compensable as "integral" to Plaintiffs' principal activities. R. 118 at 7. Defendants do not address this argument, and instead argue that Plaintiffs were not paid hourly but rather under a commission system compliant with the Section 7(i) exemption. *See* R. 122 at 12. The Court will assume that the time periods Plaintiffs address will be included in any hours calculations as time worked if Defendants are not entitled to the exemption, and a jury finds they were improperly excluded from the billing sheets.

[16] Plaintiffs generally rely on the billing sheets produced by Defendants, but include an hour and a half to each day in their hours calculations. *See* R. 107-39, 107-40, Pl. Exs. MM and NN. Although adding this time to *each* day is likely very

33

offer declarations of each of the Plaintiffs for the proposition that their supervisors told them to write a start time of 7:00am rather than 6:30am on their billing sheets. *See* R. 107, PSMF, ¶ 19. But those declarations are directly contradicted by Plaintiff Weichmann's deposition testimony—Plaintiff Weichmann indicated the start time was always 6:30am, but that occasionally he was late, so he would change his start time to 7:00am. R. 105-2, Weichmann Dep. at 66:4–14. Plaintiff Weichmann did not testify that his supervisors changed his start time on the billing sheets or told him to change his start time. *See generally*, *id*. Plaintiffs' supervisor, Brian Mortensen, also testified that Plaintiffs either had a 6:30am start time or a 7:00am start time, and either would be reflected on the daily time sheets. *See* R. 105-22, Mortensen Dep. at 68:16–69:10. Accordingly, it will be up to the jury to decide whether the billing sheets accurately reflected Plaintiffs' start time.

Second, Plaintiffs argue that they consistently worked through their lunch breaks but that those hours were not included in their daily time sheets. This is not supported by the record. Plaintiffs offer no evidence to show that "one-half hour to one hour of time was deducted from the technician's daily billing sheet for lunch breaks which they did not get or take, but worked through." R. 118 at 8. Plaintiffs do present evidence that they often worked through lunch, R. 105-2, Weichmann Dep. at 22:19–21, and that "most often time was deducted" from their daily billing sheets for lunches they did not get to take, R. 107-32, Campos Decl. at ¶ 12. But Plaintiffs fail to present any evidence that these hours were deducted on a daily

generous to the Plaintiffs, the Court finds there is a dispute of fact as to the amount of time that should be added.

basis or that they worked through lunch on a daily basis. And, the record evidence shows that Plaintiffs did not consistently work through lunch—Plaintiffs admit there were weeks that they had "10 to 15 hours down time" in which "they were required to sit and wait in a customer's driveway" or they were told "to sit in the truck and wait for the next job." R. 107, PSMF, ¶ 107. Surely Plaintiffs found time to take a lunch break during these periods. Even if there were days when Plaintiffs worked through their lunch breaks, the evidence does not support adding an hour of time worked to each day. The jury will need to determine whether lunch hours were excluded from the hourly information provided by Plaintiffs and if they were, the approximate amount of days that Plaintiffs' unused lunch breaks were incorrectly deducted from their daily billing sheets.

Finally, Plaintiffs argue they were not paid for their downtime between jobs. But Plaintiffs admit that start and end stop times for each day were included in the daily worksheets. R. 123, Resp. to PSMF, ¶ 42. Any downtime would have fallen within those start and stop times. Accordingly, these hours will already be included in any overtime calculation based on the daily billing sheets.

Plaintiffs' summary judgment motion asking the Court to find that they should have been paid hourly and that there is no genuine dispute that the above time periods were not included in hours calculations is denied.

### 2. JOINT EMPLOYMENT

The FLSA mandates that to maintain a claim for overtime compensation, an employer-employee relationship must exist. *Ash v. Anderson Merchandisers, LLC*,

799 F.3d 957, 961–62 (8th Cir. 2015). An "[e]mployer" includes "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). "A single individual may stand in relation of an employee to two or more employers at the same time under the [FLSA] . . . since there is nothing in the act which prevents an individual employed by one employer from also entering into an employment relationship with a different employer." 29 C.F.R. § 791.2(a). If the facts show that an employee is jointly employed, then his work for the entire workweek is considered as one employment under the FLSA. *Id.* "In this event, all joint employers are responsible, both individually and jointly, for compliance with the applicable provisions of the [FLSA], including overtime provisions, with respect to the entire employment for the particular workweek." *Id.*

Plaintiffs argue they are entitled to summary judgment on the issue that they were employed jointly by Defendants and that Defendants are thus jointly and severally liable for Plaintiffs' damages.[17] For Plaintiffs' argument to succeed, the Court must determine that the only reasonable conclusion to be drawn from the undisputed evidence is that these defendants are joint employers. "The joint-employment analysis turns—as does any assessment of a putative employment relationship—on the totality of the circumstances, with a particular focus on the control exercised by the alleged employer over a person's working conditions."

---

[17] Plaintiffs argue all Defendants except Mike Moreau are their joint employers. Plaintiffs point to no evidence in their summary judgment briefings that the individual Defendants Piraino, Pantano, and Horn are their joint employers, but the Court will address the argument as if made to all Defendants. It is unclear to the Court what liability Moreau faces—or how he even belongs in the case—without an argument that he is a joint employer.

*Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 363 (7th Cir. 2016); *see Moldenhauer v. Tazewell-Pekin Consol. Commc'ns Ctr.*, 536 F.3d 640, 644 (7th Cir. 2008) ("For a joint-employer relationship to exist, each alleged employer must exercise control over the working conditions of the employee.").

No simple or rigid test exists that allows a court to determine conclusively when such control is present in any given case. *Flecha v. Metal Sys., LLC*, 2017 WL 4621634, at *3 (W.D. Wis. Oct. 16, 2017). But in *Moldenhauer*, 536 F.3d at 644, the Seventh Circuit identified several relevant factors to consider in assessing an alleged employer's level of control over a worker for purposes of the FLSA, including whether the purported employer (1) had the power to hire and fire employees; (2) supervised and controlled employee work schedules or conditions of payments; (3) determined the rate and method of payment; and (4) maintained employment records. Although the *Moldenhauer* court cautioned against a view that "these are the only relevant factors, or even the most important," it suggested them as a helpful guide in applying an otherwise nebulous standard for employer "control." *Id.*

Neither party has attempted to present argument or evidence regarding the relevant factors for deciding the control issue. Instead, both parties rely primarily on the conclusory assertion that PirTano either was or was not Plaintiffs' joint employer.[18] Indeed, Defendants assert that they do not understand the relevance of Plaintiffs' joint employer argument. *See* R. 122 at 16 ("Defendants are not clear

---

[18] Defendants cite to Horn testimony, R. 123, ¶ 18, which contains only a bare denial. R. 102-1, Horn Dep. at 11:19–23 ("Q. By whom were they employed? A. Installations Professionals. Q. Did they have any employment relationship with PirTano Construction? A. No.").

about the relevance of the argument with respect to Plaintiffs' Motion for Summary Judgment. Even if Plaintiffs are correct regarding joint employer status, it does not impact the amount of unpaid wages, if any, Plaintiffs could receive."). Of course, a finding that PirTano is a joint employer would establish a basis for Plaintiffs' recovery directly against PirTano, as opposed to recovery only through Installation Professionals. Defendants appear not to be concerned with the prospect of joint and several liability, repeatedly pointing out that Plaintiffs in all events would be limited to a single recovery. It would seem by this indifference that PirTano views itself as indistinguishable from Installation Professionals, which tends to support Plaintiffs' argument. But the Court cannot say that Defendants have waived any defense they might otherwise raise to joint employer status. The only question, therefore, is whether Plaintiffs are entitled to summary judgment in their favor on the issue. *See* Fed. R. Civ. P. 56 (a) (a party may move for summary judgment on a claim or defense, *or* any *part* of a claim or defense). Plaintiffs cite to evidence that shows only that the PirTano name frequently was associated with Plaintiffs' employment. *See, e.g.,* R. 107, PSMF, ¶ 13 (PirTano leases the vehicles the technicians drive and various paperwork sometimes referred to the technician's employer as PirTano); R. 105-1, Horn Dep. at 95:18–20 (testifying that installation technicians were assigned a "PirTano tech number"). To the extent that these facts have any relevance to the joint employer issue, they are insufficient to establish joint employment exists as a matter of law.

Plaintiffs' sole argument appears to be that "[t]he interchangeability of the two companies renders them both employers of Plaintiffs." R. 118 at 4. But this is not the test. Instead, the test turns on the issue of control as shown by the factors cited by the Seventh Circuit in *Moldenhauer*. Plaintiffs' failure to make any legal argument regarding these factors with citation to appropriate evidence in the record precludes the Court from granting summary judgment in their favor on this issue. Accordingly, the joint employer issue will be reserved for trial.

### 3. DAMAGES AND ATTORNEY'S FEES

Finally, Plaintiffs argue they are entitled to liquidated damages—or alternatively prejudgment interest—because "Defendant Jack Horn knew he was violating the [FLSA]" and attorney's fees. R. 107 at 14–15. As discussed earlier in this opinion, whether Defendants violated the FLSA and whether that violation was willful is to be determined by the jury. Damages, if necessary, will be addressed after those findings have been made.

## II.    IWPCA (COUNT I) AND USERRA (COUNT IV)

The Court next turns to Defendants' summary judgment motion on Plaintiffs' remaining claims—those based on the Illinois Wage Payment and Collection Act and the Uniformed Services Employment and Reemployment Rights Act.

### A. IWPCA

In Count I, Plaintiffs allege Defendants violated the IWPCA by improperly deducting wages from Plaintiffs' pay. R. 46, Am. Compl. ¶ 65.[19] Defendants argue

_____

[19] Plaintiffs also allege that Defendants violated the IWPCA because they failed to compensate Plaintiffs for the actual time they worked each week. R. 46,

Plaintiffs' deduction claim fails as a matter of law because Plaintiffs provided written consent for each payroll deduction that was processed. Plaintiffs did not respond to Defendants' argument. Accordingly, they have abandoned their claim. *See Basta v. Am. Hotel Register Co.,* 872 F. Supp. 2d 694, 704 (N.D. Ill. 2012) (granting summary judgment on counts not addressed in summary judgment briefings). Regardless, the Court will also address the issue on the merits.

The IWPCA governs the payment of wages to employees and the deductions that an employer can make from an employee's paycheck. It provides in relevant part that wage deductions are not permitted unless "made with the express consent of the employee, given freely at the time the deduction is made." 820 ILCS 115/9. Defendants presented evidence that Plaintiffs were permitted to review all proposed deductions, and sign authorization forms before deductions were processed. R. 105, DSMF, ¶¶ 48–54. The record evidence also shows it was Defendants' regular practice to receive written consent from employees to make deductions. R. 124, Resp. to DSMF, ¶ 54 (admitting it was Installation Professionals' custom and practice to require Plaintiffs to sign the written payroll deduction form and that Plaintiffs signed off on the deduction requests). Plaintiffs do not dispute these facts, and instead make an undeveloped response to Defendants' Statement of Material Facts that the authorizations were not freely given. *See* R. 124, Resp. to DSMF, ¶¶ 50–52. But the evidence Plaintiffs cite indicates consent was not required and could

---

Am. Compl. ¶ 66. Although it is unclear whether this allegation is merely incidental to the deduction violation, neither side addresses it on summary judgment. The Court will not address nor rule on that issue here.

be freely given—Plaintiff Weichmann testified that individuals could, and did, refuse to sign the forms. R. 105-2, Weichmann Dep. at 110:12–22. There is no genuine dispute of fact that Plaintiffs provided written consent for each payroll deduction that was to be processed in accordance with the IWPCA. Defendants' summary judgment motion on the deduction claim is granted.

## B. USERRA

Plaintiff Dyal is a member of the Army Reserves who took military leave for trainings multiple times during the course of his employment. In Count IV, Plaintiffs allege that Defendants fired him because of his participation in the Army Reserves, and that his termination violated USERRA because it was made without just cause after his return from military training duty. R. 46, Am. Compl., ¶¶ 106, 107.

USERRA provides employees in the military protection for up to 180 days against discharge without cause if their most recent period of service was more than 30 days. 20 C.F.R. § 1002.247. Defendants present evidence that Plaintiff Dyal did not serve in the military for a period exceeding 30 days in the 180 days prior to his termination—evidence that Plaintiffs admit. R. 124, Resp. to DSMF, ¶ 62. Plaintiffs also fail to present any evidence that Plaintiff Dyal was terminated because of his participation in the Army Reserves, and instead admit he was terminated for insubordination, R. 124, Resp. to DSMF, ¶ 56. Finally, as on the IWCPA claim, Plaintiffs fail to address the issue in response to Defendants' motion for summary judgment. Defendants' summary judgment motion is granted.

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion for summary judgment (R. 103) on Counts I and IV, and denies Defendants' motion for summary judgment on the applicability of the Section 7(i) exemption relevant to Counts II and III. Plaintiffs' summary judgment motion (R. 106) is denied.

ENTERED:

_____
Honorable Thomas M. Durkin
United States District Judge

Dated: March 27, 2018